Filed 8/1/22 P. v. Reyes CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ISIDRO GOMEZ REYES,<br><br>    Defendant and Appellant. | F080133<br><br>(Super. Ct. No. PCF331316A)<br><br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALFRED GOMEZ,<br><br>    Defendant and Appellant. | F080305<br><br>(Super. Ct. No. PCF331316B) |

APPEAL from judgments of the Superior Court of Tulare County. Michael B. Sheltzer, Judge.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant Isidro Gomez Reyes.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Alfred Gomez.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, William K. Kim, Robert K. Gezi and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Alfred Gomez and Isidro Gomez Reyes were convicted by jury of murder and attempted murder, each with a gang-related crime enhancement (Pen. Code,[1] § 186.22, subd. (b)). They raise several claims generally relating to gang evidence.

Together, Gomez and Reyes primarily assert various evidentiary issues, instructional error, and prosecutorial error undermine the convictions and enhancements. Separately, Reyes contends his *Miranda*[2] rights were violated. We disagree with these contentions.

Secondarily, Gomez and Reyes cite newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) (AB 333) as a basis for relief. They argue the bill requires us to reverse the entire judgment or, alternatively, the gang enhancements.

AB 333, signed into law while this case was pending appeal, significantly altered gang laws in two ways. One, it amended section 186.22 by increasing the evidentiary showing necessary to prove not only the gang enhancement (§ 186.22, subd. (b)) but also

---

[1] Undesignated statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2.

a criminal street gang's existence.[3] Two, it created section 1109 which mandates bifurcating section 186.22 charges upon request.

We conclude any error related to section 1109 and bifurcation is harmless. The amendments to section 186.22, however, require reversal. Accordingly, we will vacate the gang enhancements in the disposition, and otherwise affirm the convictions.

## BACKGROUND

**Charges**

The Tulare County District Attorney charged Gomez and Reyes with two crimes: murder (§ 187; Count 1) and attempted murder (§ 664/187; Count 2). Each count included a gang-related crime allegation (§ 186.22, subd. (b)).

**Evidence**

This case involves two victims. One was killed, the other survived. As the victims were walking down the side of a road, Gomez and Reyes pulled up behind them in a car. Gomez exited, pointed a shotgun at one victim and pulled the trigger but nothing happened. That victim ran away. Gomez then shot and killed the other victim.

According to the surviving victim, he had previously seen the same car pass him multiple times on the road earlier that day. He recognized Reyes as the driver and reported that fact along with a description of the suspect car to law enforcement.

Law enforcement officers began surveilling Reyes's nearby residence a few hours after the shooting. Officers noticed a vehicle matching the suspect description arrive at the property but could not "identify … any occupants of the vehicle when they approached the residence." A short while later, the vehicle left the property.

---

[3] A criminal street gang's existence must be proven under many statutes beyond the gang enhancement. (E.g., §§ 182.5, 186.22, subd. (a), 190.2, subd. (a)(22), & 12022.53, subd. (e).)

3.

Officers seized the vehicle; Gomez was the lone occupant. The surviving victim subsequently identified the car as involved in the shooting and Gomez as the shooter. Reyes was later arrested the same day.[4]

Reyes was interviewed by officers. Reyes denied leaving his house that day and claimed several people were home with him but never mentioned Gomez.

Officers searched Reyes's residence. They found ammunition on the property matching the brand and model used in the shooting—Winchester PDX.[5]

One witness testified Gomez and Reyes were together in the suspect vehicle *one day prior* to the shooting. The witness observed Gomez and Reyes remove a clothed object from the vehicle's trunk. The witness's claim was impeached by an officer who interviewed the witness prior to trial. According to the officer, the witness observed Gomez and Reyes together in the suspect vehicle remove an unknown object from the trunk *a few hours after* the shooting.

Testimony from a prior hearing was read into the record. This testimony corroborated the fact Gomez and Reyes were together in a car shortly after the shooting and removed an unknown object from its trunk.

Various witnesses testified about the gangs in Tulare County. The Norteño gang is active in Tulare County. One way to join the gang is to "commit a crime" and "spill blood against the gang's enemy …."

---

[4] The circumstances surrounding Reyes's arrest are unclear from the record. The facts are he was arrested and claimed to be home the entire day. The best description of Reyes's arrest is the following question and answer:

"Q: Now, a search warrant was conducted at your house. Do you remember that?

"A: Well, when they arrested my son, they didn't have no warrant -- no warrant to take my son yet. So I don't know."

This exchange suggests Reyes was arrested in the home during the search.

[5] There was no forensic testing to match the ammunition.

The Norteño gang's primary activities include "homicide[ and] attempted homicide …." The Norteño gang had previously committed manslaughter and assault with a firearm in two documented cases.[6] The victims of these documented crimes were rival gang members. The evidence indicated Reyes was a Norteño during the shooting while Gomez was a Norteño associate.

While Gomez was incarcerated following his arrest, he ascended to full Norteño membership. Evidence proving his ascension consisted of "kite" possession and connection to objects consistent with weapons. A kite "is a handwritten note by an inmate." Gang-related kites are distinctive. On one occasion, Gomez destroyed gang kites. On another occasion, he was caught smuggling kites. Only gang members are entrusted to possess kites.

An expert witness testified about hypothetical situations involving a gang. He opined a scenario similar to the facts in this case benefits the gang by enhancing its reputation for violence. The expert explained the crime benefits the gang even if the victim is not gang affiliated. He also believed such a crime was in association with a gang due to the actors' affiliation to the gang and the gang's relationship to the territory.

**Verdict and Sentence**

Gomez and Reyes were found guilty as charged. They were each sentenced to serve 82 years to life in prison.

## DISCUSSION

The claims presented on appeal follow in order. Was the evidence sufficient to prove the gang-related crime enhancements? If not, did the gang evidence taint the convictions on the underlying crimes? Did the court properly admit Gomez's gang-related activity while incarcerated after the shooting? Did the preliminary hearing

---

[6] These documented crimes were introduced to establish a pattern of criminal gang activity. (See § 186.22, subd. (e).)

testimony violate the Sixth Amendment right to confrontation? Did eyewitness-identification jury instructions violate due process? Did the prosecutor err in closing argument? Is there cumulative error? Were Reyes's *Miranda* rights violated? Do the AB 333 amendments to section 186.22 require vacating the gang enhancements? Does newly enacted section 1109 mandate reversing the underlying convictions?

After careful examination, we find no prejudicial error except with respect to the AB 333 amendments to section 186.22. Accordingly, we will vacate the gang-related crime enhancements and remand for further proceedings.

## I. The Evidence Sufficiently Proved The Gang-Related Crime Enhancements

In sum, Gomez and Reyes argue "the [shooting] did not have gang overtones." Specifically, he points out the incident did not involve gang colors, gang signs, gang slurs, and there was little, if any, evidence he and Reyes knew the victims. In other words, there was no evidence the victims were connected to any gang.

The People argue "[t]hat a member and an associate of a criminal street gang committed a felony together – without regard as to whether the victim(s) were rival or 'no good' gang members/associates – should be sufficient to support the inference that they committed the felony in association with the gang," citing *People v. Albillar* (2010) 51 Cal.4th 47, 60-63 (*Albillar*). They also rely on territorial themes.

We find the evidence sufficient to prove the gang enhancements because it fairly proved Gomez committed the crime, with Reyes's help, to initiate into the Norteño gang. As explained below, this is true notwithstanding the minimal gang evidence attending the shooting itself or the absence of evidence Gomez and Reyes knew the victims.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1,

6.

27.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*Ibid.*)

The "gang enhancement applies to 'any person' convicted of a number of enumerated felonies, including murder and unlawful possession of a firearm by a felon, that were (1) ' "committed for the benefit of, at the direction of, or in association with any criminal street gang," ' and (2) ' "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 331.)

Here, the evidence indicated Reyes was a Norteño gang member while Gomez was a Norteño associate. After Gomez committed the shootings, he became a full gang member while incarcerated in jail. His membership in the gang was proven by his possessing kites. Because Gomez was arrested shortly after the shooting, nothing intervened between the shooting and his acceptance into the gang. In other words, the shooting was reasonably related to his elevation into the gang. This is consistent with the expert's explanation committing a crime is one way to join the gang. Accordingly, the shooting benefited the gang because it inducted another member into its ranks which in turn empowers the gang by increasing its numbers. It was likewise associated with the gang because it was gang motivated, i.e., committed to initiate a new member.[7]

---

[7] The prosecutor relied on this theory in closing argument: "Well, the motive here is gang. It is absolutely gang. Both of the defendants are Norteño gang members. [Gomez] was more of … an associate. Someone who is willing to put in work, earn their stripes, and elevate themselves in this gang. How do you do that? By shedding blood."

Whether the evidence proved a specific intent to promote criminal conduct by gang members is an admittedly more difficult question. We believe, however, a gang initiation is perhaps conduct most quintessential with promoting criminal conduct by the gang at large. This is so because the Norteño gang is a criminal street gang with primary activities involving various crimes. Increased membership leads to more crime and greater success.

As illustrated, the jury could rationally conclude Gomez was initiated into the gang. (See *People v. Abilez* (2007) 41 Cal.4th 472, 508 (*Abilez*) [subsequent conduct may constitute circumstantial evidence of intent at the time of the offense].) It could subsequently infer increasing gang membership promotes the gang's ability to commit crimes in general. Combined, the jury could conclude the shooting was committed with the intent to promote criminal conduct by gang members. In conclusion, the evidence proved the gang enhancements beyond a reasonable doubt.

## II. The Gang Evidence Was Properly Admitted and Did Not Taint the Underlying Convictions

Gomez argues his "right to a fair trial was trampled beneath the weight of highly prejudicial, irrelevant gang evidence, especially [his] post-offense Norteño gang activities while in jail awaiting trial …." Reyes joins the argument. Because we have rejected the insufficient evidence argument, we may quickly reject this claim insofar as it assumes the gang evidence was irrelevant and prejudicial.

Whether Gomez's post-arrest conduct while incarcerated was properly admitted presents a separate question. We find the evidence was properly admitted to prove the motive underlying the shooting.

"Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) 'The trial court has broad discretion to determine the relevance of evidence [citation], and we will not

8.

disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation].' " (*People v. Wright* (2021) 12 Cal.5th 419, 448.)

But not all relevant evidence is admissible. " ' "Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." [Citation.] "Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.] The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect." ' [Citation.] When reviewing the admission of other crimes evidence to show motive, ' "a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 610 (*Johnson*).)

Moreover, " '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) ' " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of

the substantial likelihood the jury will use it for an illegitimate purpose.' " ' " (*Johnson, supra,* 12 Cal.5th at p. 610.)

Gang evidence is relevant and admissible when the motive underlying the crime is gang related. (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953 (*Franklin*).) " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Ibid.*)

"A consideration of impermissible prejudice that might flow from otherwise relevant evidence evaluates how inflammatory the uncharged act is when compared to those charged. Whether the uncharged act was not previously adjudicated is also a relevant consideration." (*People v. Holmes, McClain, and Newborn* (2022) 12 Cal.5th 719, 771.) Postcrime conduct is admissible if relevant. (*Abilez, supra,* 41 Cal.4th at p. 508.)

The gang evidence in this case was relevant to prove motive. Motive featured heavily at trial as it placed into context an otherwise random act of violence.

The facts Gomez possessed kites and weapons while in jail helped prove the gang-initiation theory because it revealed his transformation from gang associate to gang member after committing this crime.[8] This evidence was not inflammatory compared to the shooting.[9] (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*) [gang evidence "is often relevant to, and admissible regarding, the charged offense"].) The fact the conduct at issue here was not formally adjudicated is, in our view, immaterial. The trial court did not abuse its discretion in ruling the evidence was

---

[8] The court admitted the evidence for this exact purpose.

[9] The court instructed the jury gang evidence was limited to proving intent, knowledge, purpose, and motive. The instruction explained the jury could "not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

admissible.  (See *In re White* (2020) 9 Cal.5th 455, 470 [abusing discretion means "a decision [is] so arbitrary or irrational that no reasonable person could agree with it."]; *People v. McKinnon* (2011) 52 Cal.4th 610, 655 [standard of review].)

## III. Preliminary Hearing Testimony Properly Admitted

According to Gomez, **"**The court allowed the prosecutor to introduce the former testimony of … a witness from the preliminary hearing who apparently did not receive, or failed to cooperate with, a trial subpoena mailed to her six months before trial.  The court conducted a diligence hearing where witnesses described a last-minute and lackluster effort to locate [the witness'] whereabouts in Missouri."

Reyes joins the claim.  He adds the People were required to "avail themselves of the Uniform Act to Secure the Attendance of [] Witnesses Without the State in Criminal Cases …."

The People claim the preliminary hearing testimony was properly admitted.  We conclude the prior testimony was properly admitted and, in any event, it was harmless beyond a reasonable doubt.

### A.  Additional Background

During the trial, the court held a hearing on whether the prosecution exercised due diligence in securing a witness's attendance for the trial.  Several people testified at the hearing.

An investigator for the prosecution testified he was assigned to locate the witness two or three days before July 24, 2019.[10]  He learned there was a "misdemeanor warrant" for her arrest in Tulare County.  He was aware the Tulare County District Attorney had filed welfare fraud charges against the witness.  Notes regarding the witness indicated she had moved to Missouri in June.  The investigator unsuccessfully attempted telephonic contact with the witness.  He did not contact any prosecutor in Missouri, did not check

---

[10] All references to dates are to dates in 2019 unless otherwise stated.

11.

her recent criminal history, did not contact the post office, and did not contact the Department of Motor Vehicles.

The investigator confirmed the witness's phone number and the fact she moved to Missouri. No attempts to locate the witness were made after August 2 because the investigator believed efforts were exhausted. He explained subpoenas are generally mailed to witnesses two to three months before trial commences. Other people made prior efforts to subpoena this witness but the investigator lacked details explaining those efforts. An investigator like himself is usually last in line to attempt to serve a subpoena.

A second investigator explained she began in March attempting to locate the witness in the unrelated fraud case.[11] On May 7, she spoke over the phone with the witness who stated "she was not planning to come back to California." This investigator explained the fraud case was a felony but there was no other information or effort to locate the witness. This information was not shared with other investigators in the office, including the investigator attempting to locate the witness in this case. The prosecutor then explained the witness failed to appear in court on a misdemeanor case on June 25 and 27.

Gomez presented evidence through a retired law enforcement officer. This retired officer explained he was able to utilize a database to search for and ascertain the witness's current address within "[t]wo minutes."

The court ruled as follows:

> "The Court, in determining whether or not there's been due diligence, looks at a number of factors. One is the character of the proponent's efforts. Whether the proponent reasonably believed before trial that the witness would appear voluntarily and, therefore, didn't have the witness subpoenaed when or she might have been available. Thirdly, whether the search to locate the witness had begun timely, and, in this instance

---

[11] By unrelated, we mean only unrelated to the charges in this case.

significantly, whether the witness would have been produced if due diligence had been exercised. And that's really what all of this testimony went to is even with the address, even with the ability to serve an out-of-state subpoena, the question is whether or not those efforts would have been sufficient to compel the witness's testimony. This is a person who not only has a pending felony welfare fraud case that apparently she's aware of, but also has a pending misdemeanor warrant on her own failure to appear. The prospect of her returning, even under subpoena, means that she, in all likelihood, would be arrested as soon as she came back into Tulare County.

"So the real question is, to the Court at least – yes, it is true that apparently the witness might have been easy to locate, but what the Court needs to do is to look at the efforts that were made and not at all possible means of finding or locating the witnesses – or the witness. There are a lot of cases where the effort to locate the witness was delayed somewhat. In fact, there are cases that deal with due diligence during the course of trial. And so, really the question is whether, based on the information that the [prosecution] had at their disposal at the time they were trying to locate the witness – namely, [the investigator] was aware apparently of numerous attempts by other investigative agencies within the District Attorney's Office to locate the witness. He also spoke to the defendant's [sic] mother, I think, who indicated that the person – that [the witness] was living in Missouri. He called and they contacted a cell phone and left a message, which was not responded to. He confirmed that it was the correct message address – or message phone number. And so then the question at really the crux of the issue is whether or not exercising of further diligence would have produced the witness or whether those attempts would have been futile. And again, the due diligence exercised was not perfect by any means, and did it was begun relatively late in the game; however, the information provided to the investigator was such that I think they can reasonably conclude that further efforts would have been futile, and that given the existence of the misdemeanor – not the warrant, but the failure to appear, that she had willfully avoided process of the Court in her own case leads the Court to the conclusion that even if they had exercised further diligence, the efforts to subpoena her out of state, even with a valid address, which apparently was quite easily

13.

> obtainable, would not have resulted in her complying with the Court's long-distance order that she appear.
>
> "On balance, the Court is going to find that due diligence was exercised. I am going to find that the witness is unavailable, and I will allow her testimony to be read into the record."

The witness's preliminary hearing testimony was later read into the record.

As recounted above, the preliminary hearing testimony disclosed the witness observed Gomez and Reyes a few hours after the shooting. They were together in a vehicle matching the suspect description and stopped to remove an unknown object from the trunk.

### B. Analysis

"A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. [Citations.] The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must 'have made a good-faith effort to obtain his presence at trial.' " (*People v. Smith* (2003) 30 Cal.4th 581, 609.) "[T]he prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented." (*People v. Herrera* (2010) 49 Cal.4th 613, 623.)

A good-faith effort, known as due diligence, " ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character." [Citations.] Relevant considerations include " 'whether the search was timely begun' " [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].' [Citation.] 'When, as here, the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially.' " ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 675 (*Fuiava*).)

14.

The record in this case demonstrates due diligence. At the outset, and to quote the trial court, we acknowledge the "diligence exercised was not perfect by any means, and … it was begun relatively late in the game …." But good faith and substantial efforts were made to locate the witness.

Multiple people attempted to locate and serve the witness with a subpoena. The witness's precise location was unknown. The search lasted at least ten days. Although little was done to ascertain the witness's address, overall the search was reasonable considering the witness's testimony was immaterial. (*Fuiava, supra,* 53 Cal.4th at p. 676 ["reasonableness of the [search] is supported by the circumstance that [witness] testimony was not of critical importance in the trial"].)

In regard to whether the search began *too* late, we note it began before trial and more than one week before the first witness testified at trial.[12] This was appropriate in light of the fact the witness had previously cooperated with testifying and her testimony was not vital. The prosecution is not obligated " 'to keep "periodic tabs" on every material witness in a criminal case,' " much less so an immaterial witness. (*Fuiava, supra,* 53 Cal.4th at p. 676.) The fact " 'additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion." (*Id.* at p. 677.)

Last, the **"Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases"** is of no avail.[13] (§ 1334.) The act is codified at sections 1334-1334.6. By its terms, the act applies only to "material" witnesses. (*Cogswell, supra,* 48 Cal.4th at p. 471 ["Under the Uniform Act, as adopted in California, a party in a criminal case can ask a court in the state where an out-of-state material witness is located

---

[12] The first witness testified on August 1. The search began prior to July 24. The preliminary hearing testimony was read into the record on August 8.

[13] Reyes raises the act in his briefs. We choose to briefly address it here because it often proves relevant to due diligence. (See, e.g., *People v. Cogswell* (2010) 48 Cal.4th 467, 476-479.)

15.

to subpoena the witness and also to have the witness taken into custody and brought to the prosecuting state to testify."].) Because the witness in this case was immaterial, the prosecution could not invoke the act to secure her attendance at trial. Due diligence does not require frivolous action.

In any event, we would find any error harmless. "To determine whether a confrontation clause violation is harmless beyond a reasonable doubt, courts consider 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*People v. Foy* (2016) 245 Cal.App.4th 328, 351.)

The witness's preliminary hearing testimony was relatively unimportant. Another witness testified to essentially the same facts. In fairness, that witness partially recanted a prior statement by testifying what she witnessed occurred on a different date. In this situation, the preliminary hearing testimony certainly served to corroborate the other witness's prior, more damaging statement.

But the point of the evidence was that Gomez and Reyes were together in the suspect vehicle a few hours after the shooting. There was no doubt Gomez and Reyes were in close proximity—they were both located on the same property near in space and time to the shooting. The suspect vehicle was seized; it existed, both near in space and time to the shooting. These facts were beyond reasonable dispute.

Contrary to Gomez's suggestion, the prosecution's case was not weak. The surviving victim unfalteringly identified Gomez, Reyes, and the vehicle as involved in the shooting. Each was discovered on the same property hours after the shooting. Ammunition similar to that used in the murder was found elsewhere on the same

property. Accordingly, any error in admitting the preliminary hearing testimony was harmless beyond a reasonable doubt.[14]

## IV. Eyewitness Jury Instructions Did Not Violate Due Process

Identification was hotly contested at trial. Gomez argues the eyewitness jury instruction, CALCRIM No. 315, "violates the Constitution's guarantee of due process of law" because it includes "an eyewitness's level of certainty" as a valid consideration. Reyes joins. The People contend the argument is forfeited. They also contend any error is harmless. We simply conclude the instruction did not violate due process.

### A. Additional Background

Both defense counsel heavily challenged the surviving victim's identification of Gomez and Reyes as the perpetrators. They also attempted to impugn the investigating officers' techniques by undermining the identification procedures.

The court subsequently instructed the jury with CALCRIM No. 315. In part, the instruction states, "In evaluating identification testimony, consider the following questions …." It then lists more than one dozen factors including, "How certain was the witness when he or she made an identification?"

### B. Analysis

The California Supreme Court recently held "nothing in CALCRIM No. 315's instruction on witness certainty … operates to 'lower the prosecution's burden of proof.' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 657.) It also found listing eyewitness certainty as one factor to evaluate does not render a trial fundamentally unfair. (*Id.* at p. 646.) Finally, it noted the defense had the opportunity to, and actually did, contest eyewitness identification. (*Id.* at p. 660.) This case is no different.

---

[14] Gomez also argues the trial court did not actually find due diligence. Instead, he claims the court created its own standard relative to futility. The court's ruling explicitly "[found] that there … was due diligence in attempting to locate the witness" and we decline to consider whether the court meant something other than what it held.

17.

Both Gomez and Reyes vigorously examined the surviving victim's identification. They questioned the identification itself by pointing out several inconsistencies[15] and challenged the process underlying the identification by highlighting suggestiveness. Accordingly, this claim fails because the instruction is not constitutionally defective and Gomez had a fair opportunity to argue misidentification.

## V. The Prosecutor Did Not Err

In rebuttal argument, the prosecutor concluded by repeatedly prefacing several facts with, "What are the odds …." Gomez now asserts the prosecutor "misstated the law and unduly risked misleading the jury concerning its burden of proof in violation of the state and federal constitutional right to due process." He anchors the assertion to an ineffective assistance claim, arguing his trial counsel was deficient for not objecting to the prosecutor's rebuttal. Reyes joins.

The People believe the claim is forfeited because there was no objection during the trial. The People also argue the prosecutor did not err. We agree there was no error.

### A. Additional Background

The relevant portion of the prosecutor's rebuttal argument follows:

> "I'm going to just leave you with this thought. What are the odds that [the surviving victim] immediately identifies [Reyes], someone he knows, [Reyes] with the silverish Toyota with another Hispanic male passenger? A .12 page [sic] shot gun. [Winchester] PDX … rounds found in the road. [The surviving victim], a southern associate. [The deceased victim], no longer an active Norteño. Disrespect to the gang, right? And then what are the odds that [Reyes] – there is a[ Reyes] who lives down the street, and what are the odds that that [Reyes] is with his cousin [Gomez], a Hispanic male, in his silverish, gold, beige Toyota all day long? What are the odds? What are the odds that he then is shown a six-

---

[15] For example, they emphasized inconsistencies in describing the vehicle and pointed out statements the surviving victim made for the first time at trial relative to previous encounters with Gomez.

pack photo lineup of [Reyes] and immediately identifies him because it's the person he knows? What are then the odds that he separately – completely separately identifies [Gomez], the person that he saw murder his friend. And then what are the odds that at [Reyes]'s home, right down the street, there is that exact same round of ammunition? What are the odds? What are the odds then that the vehicle that these two were in, this Toyota, then has many particles consistent with gunshot residue inside and out on the passenger side where [the surviving victim] saw the individual going? What are the odds? What are the odds then that these two happen to be rivals to [the victims]? They are Norteños. What are the odds?

"What are the odds that of every person who saw them that day cannot tell you where they were between the hours of 12:00 and 1:00 that day? What are the odds? What are the odds? Well, this isn't just one big coincidence. This is because the defendants are guilty of murdering [the deceased victim] and attempting to murder [the surviving victim], and I ask that you find them guilty as charged."[16]

Neither Gomez nor Reyes objected.

## B. Analysis

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) "To establish such error, bad faith on the prosecutor's part is not required." (*Id.* at p. 666.) "In the absence of prejudice to the fairness of a trial, a

---

[16] For clarity, to the extent not summarized in the primary factual background, the prosecutor's argument was entirely rooted in the evidence presented at trial.

19.

prosecutor's errant remarks do not require reversal." (*People v. Dworak* (2021) 11 Cal.5th 881, 914 (*Dworak*).)

"As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial [error] unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' [Citation.] The defendant's failure to object will be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*Centeno, supra,* 60 Cal.4th at p. 674.)

We note "[n]othing in this record indicates that an objection would have been futile. Nor was the prosecutor's argument so extreme or pervasive that a prompt objection and admonition would not have cured the harm." (*Centeno, supra,* 60 Cal.4th at p. 674.) Ordinarily, this would forfeit the issue. (See *ibid.*) But we choose to address the claim on its merits. (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

Here, the prosecutor did not imply mathematics proved guilt. Instead, the argument "simply employed a rhetorical device calculated to focus the jury's attention on strong circumstantial evidence of guilt and on any corresponding weaknesses in the defense case." (*People v. Bemore* (2000) 22 Cal.4th 809, 847.) We have no reason to believe the jury understood the argument to mean anything less than proof beyond a reasonable doubt was necessary to prove guilt; in fact, quite the opposite.

The prosecutor's argument fairly implied stacking inference upon inference equaled proof beyond a reasonable doubt because, as the inferences increased, reasonable doubt declined. This understanding is natural and we will not infer a more prejudicial interpretation.

We also recognize the court properly instructed the jurors on reasonable doubt.[17] "Jurors are presumed able to understand and correlate instructions and are further

_____

[17] See CALCRIM No. 103.

20.

presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).) Gomez has not overcome this presumption.

Finally, there was no ineffective assistance relative to the prosecutor's rebuttal argument because the argument was not objectionable. (*People v. Bell* (2019) 7 Cal.5th 70, 125 [deficient performance is a prerequisite to proving an ineffective assistance claim].) The claim of prosecutorial error fails.

## VI. Reyes Impliedly Waived *Miranda* Rights

Reyes argues the court erred in admitting a portion of his interview with investigators. He claims the evidence was insufficient to show he understood his *Miranda* rights. The People argue Reyes "understood and knowingly waived [his] rights." We agree with the People.

### A. Additional Background

Investigators interviewed Reyes after his arrest. An officer informed Reyes of his rights as follows:

> "[Y]ou have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you … while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. … [Y]ou can decide at any time to exercise these rights and not … answer any questions okay? So you had … mentioned to me that you work for a …."

Notably, the officer never asked if Reyes understood his rights and instead immediately jumped into the interrogation.

As the interview progressed, Reyes denied leaving his house the day the shooting occurred. He mentioned he was at home with several family members, listed them, but did not mention Gomez. Ultimately, Reyes invoked his right to remain silent.

Reyes moved to exclude his denials from evidence. In ruling on the motion, the court stated, in part:

"[I]t seems to me that one of the pieces that goes into the calculus in determining whether or not there's an understanding waiver is the assertion of the rights as well. He knew he -- the defendant knew when he wanted to pull the plug on the interview. When they started talking to him about the facts of the case, beyond just basic stuff about, 'Who lives here?' 'What do you guys do?' You know, 'Where were you?' It's starting to get close to interrogating questions regarding the incident, and, hey, you better come clean kind of stuff. You know, 'Confession is good for the soul.' 'What about your mom and the dad?' All of the techniques that they used are demonstrated here in trying to overbear his will and he holds firm. The Court's view is that this defendant knowingly and understandingly waived his right when the officer said, 'I want to ask you some stuff about where you were today,' and he says, 'Okay.' The Court views that as an implied waiver given the whole context of the statement where he was perfectly capable to exercise his rights, which he did repeatedly in the face of some pretty persistent interrogation …."[18]

The interview depicting Reyes's denials was then played for the jury.[19]

## B. Analysis

The prosecution bears "the burden to establish waiver by a preponderance of the evidence." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 383-384 (*Berghuis*).) "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." (*Id.* at p. 384.) "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' " (*Ibid.*)

"If the [prosecution] establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to

---

[18] Technically, this quote is from the court's tentative ruling. After further argument, it appears there was no formal ruling to admit the evidence.

[19] Reyes's invocation of the right to silence was excluded, as were all subsequent statements in the interview.

demonstrate 'a valid waiver' of *Miranda* rights. [Citation.] The prosecution must make the additional showing that the accused understood these rights." (*Berghuis, supra,* 560 U.S. at p. 384.) "The critical question with respect to waiver is whether it was knowing and voluntary, which is 'directed at' " evaluating "state of mind." (*People v. Flores* (2020) 9 Cal.5th 371, 417 (*Flores*).) " '[T]he question of waiver must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." ' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1216.)

" 'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*Flores, supra,* 9 Cal.5th at p. 418.)

The record in this case established an implied waiver. The best evidence for waiver is the fact Reyes actually exercised his right to remain silent. Invoking his right to remain silent necessarily implies he understood the right. This establishes " 'a course of conduct indicating waiver.' " (*Berghuis, supra,* 560 U.S. at p. 384; *People v. Krebs* (2019) 8 Cal.5th 265, 302 ["When a suspect ' "having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them." ' "].) The *Miranda* claim lacks merit.[20]

---

[20] Further bolstering the fact Reyes understood his right to remain silent is the fact he invoked it more than three dozen times. Regrettably, the investigators did not scrupulously honor Reyes's right to remain silent. Instead, they persisted in interrogating Reyes, going so far as to explicitly deny requests to terminate questioning. Reyes did not budge and, in any event, all statements after the initial invocation, i.e., the repeated invocations, were excluded from evidence.

## VII. No Cumulative Error

Gomez and Reyes argue reversal is appropriate due to cumulative prejudice from multiple errors. Having found no errors, we reject this claim.

## VIII. AB 333 Necessitates Vacating the Gang Enhancements

After the trial proceedings concluded in this case, the Legislature enacted AB 333. AB 333 added section 1109 which, as relevant, requires upon request a trial court to bifurcate gang enhancements (§ 186.22, subds. (b) & (d)) from charged crimes. It also amended section 186.22 by increasing the threshold evidence necessary to prove not only the gang enhancement but the existence of a criminal street gang itself.[21]

Gomez claims section 1109 applies retroactively and requires us to reverse the entire judgment. Reyes joins in essence.

The People argue section 1109 does not apply retroactively. As for the amendments to section 186.22, the parties agree they apply retroactively and are prejudicial. E.

We do not address whether section 1109 applies retroactively because we conclude nonbifurcation was harmless. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.) We find the amendments to section 186.22 apply retroactively. Having reviewed the record, we agree with the parties, including the People, the amendments to section 186.22 justify vacating the gang enhancements.

### A. Retroactivity

"[A]bsent evidence to the contrary, [we presume] the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date. [Citations.] This

---

[21] When relying on gang benefit to prove the enhancement itself, AB 333 now requires more than a "reputational" benefit. (§ 186.22, subd., (g).) See *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032—1033 for a more complete summary of amendments relating to proving a gang's existence (§ 186.22, subd. (f)).

principle also applies when an enhancement has been amended to redefine to an appellant's benefit the conduct subject to the enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344 (*Lopez*).)

The rule applies "to statutes that merely ma[k]e a reduced punishment *possible*." (*People v. Frahs* (2020) 9 Cal.5th 618, 629.) It " 'rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)

There is no doubt AB 333's amendments to section 186.22 apply retroactively. Those amendments "increase[] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement ...." (*Lopez, supra*, 73 Cal.App.5th at p. 344.) It is an ameliorative amendment. (*Id.* at p. 343.)

As for section 1109, we do not address whether it applies retroactively, because we will conclude any error is harmless.[22]

---

[22] Gomez and Reyes also suggest section 1109 error is reversible per se. The argument is largely based on *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743. But *Burgos* never held section 1109 error is reversible per se—its reference to structural error, i.e., reversal per se, is pure dicta. (See *id.* at p. 568 ["This circumstance likely constitutes 'structural error' ...."].) Indeed, for good reason no case has held section 1109 error is reversible per se—there is no reason to believe the issue escapes review. (Cf. *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819 [failure to grant severance reviewable for prejudice]; *People v. Henderson* (2020) 9 Cal.5th 1013, 1029 [erroneously admitted confession reviewable for prejudice]; *People v. Gonzalez* (2021) 12 Cal.5th 367, 398—399 [erroneously admitted forensic evidence reviewable for prejudice]; *People v. Partida* (2005) 37 Cal.4th 428, 439 [evidence resulting in "*fundamentally unfair*" trial reviewable for prejudice].) We hold, assuming section 1109 applies retroactively, the issue is reviewable for prejudice.

**B. Prejudice**

We next analyze prejudice and first discuss section 1109. Because we find the section 1109 issue harmless, we turn to the section 186.22 amendments and explain why it is necessary to vacate the gang enhancements.

**i. Section 1109**

Gomez and Reyes argue "prejudicial gang evidence … undermine[d] the trial's fairness." Accordingly, they claim the prejudice should be assessed for harmlessness beyond a reasonable doubt. The People assert the issue is reviewable under the reasonable-probability-for-a-more-favorable-result standard.[23] We agree with the People.

Although it is true in some cases a person's due process rights could be violated, triggering review for harmlessness beyond a reasonable doubt, there is no due process violation in this case. The evidence here was properly admitted and there is no reason to conclude it rendered the trial fundamentally unfair. Nothing prevented Gomez or Reyes from challenging the evidence or presenting their own defense. In fact, they did so rigorously.[24]

Turning to the reasonable probability of a more favorable result, we find lack of bifurcation harmless. The most significant evidence admitted in this trial which would have been excluded in a bifurcated proceeding are the Norteño gang predicate offenses— manslaughter and firearm assault. Much of the other evidence would have been properly

---

[23] To reiterate, Gomez also argues the judgment is reversible "per se." The People claim section 1109 does not apply retroactively. We do not address whether section 1109 applies retroactively, conclude reversal per se is unwarranted, and instead focus on each party's alternative arguments relative to prejudice.

[24] Gomez suggests his due process rights were violated because the gang evidence was "inflammatory" and "likely to elicit an emotional reaction" from the jury. We disagree. We have already concluded the evidence was properly admitted to prove motive. The trial was not fundamentally unfair.

admitted even in a bifurcated trial because gang evidence "is often relevant to, and admissible regarding, the charged offense. Evidence of … gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez, supra,* 33 Cal.4th at p. 1049; accord *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129—1130.) Such is the case here.

The crimes in this case were tried as a gang initiation. Based on the evidence presented, the crime occurred to initiate Gomez into the Norteño gang. To reiterate, properly admitted gang evidence proved both who committed the crime and why.

Beyond the gang evidence, the case against Gomez and Reyes was strong. Gomez was identified as the shooter without hesitation. Reyes was identified as the driver without hesitation. Both were located near the crime scene. Both were connected to property containing ammunition matching that used in the shooting. The gang evidence added little to these facts. There is no reason to believe the nondescript predicate offenses improperly tipped the scales.[25] For these reasons, we find the section 1109 bifurcation issue harmless.[26]

---

[25] On this point, Reyes concedes much of the gang evidence would have been admitted in a bifurcated proceeding. But he claims the predicate offenses, the gang's primary activities, and the expert witness's opinions would have been excluded. He concludes "this extraneous evidence must have scared the dickens out of the jurors selected to try this case." We disagree for the reasons explained. Even if we agree the primary activity and opinion evidence would have been excluded in a bifurcated trial, their presentation in this case was not egregious, inflammatory, or provocative.

[26] The court also instructed the jury the gang evidence was admissible only to prove, knowledge, intent, motive, and purpose. The jury could not "conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*Sanchez, supra,* 26 Cal.4th at p. 852.) There is no reason to believe this presumption fails.

### ii. Section 186.22

"Although AB 333 transforms section 186.22 in several respects, we focus on one change in particular. To prove the existence of a criminal street gang itself, section 186.22, subdivision (f), requires proof of 'a pattern of criminal gang activity.' 'The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses.' (*People v. Valencia* (2021) 11 Cal.5th 818, 829 (*Valencia*).) [¶] Prior to AB 333, it was unnecessary to prove predicate offenses were gang related. [Citation.] Now, the law requires 'the [predicate] offenses [to] commonly benefit[ ] a criminal street gang, and the common benefit of the offense is more than reputational ....' [¶] As now defined by statute, there was no [competent] evidence the predicate offenses proven at trial commonly benefitted a gang. (See § 186.22, subd. (g) [defining what constitutes a more than reputational common benefit].)" (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823, fns. omitted.) This is true because, as Gomez points out, the evidence describing the predicate offenses in this case violated the right to confrontation as interpreted by *Valencia, supra*.[27] The People concede. On this basis, we vacate the gang enhancements.[28]

### DISPOSITION

The section 186.22 enhancements in each case are vacated. The section 12022.53 enhancement in Reyes's case is vacated. The convictions are otherwise affirmed. The

---

[27] Specifically, *Valencia, supra,* explains "the particular facts offered to prove predicate offenses as required by [section 186.22] are not the sort of background hearsay information about which an expert may testify. Competent evidence of those particulars is required." (*Valencia, supra,* 11 Cal.5th at p. 839.) Because the record in this case belies *Valencia*, it does not meet this standard and does not satisfy AB 333. The People concede reversible error in this case.

[28] Vacating the gang enhancements requires us to vacate the section 12022.53 enhancement in Reyes's case because it applies only if the gang enhancement is found true. (§ 12022.53, subd. (e).) The People may retry all vacated enhancements.

cases are remanded and the trial court is directed to conduct further proceedings consistent with this opinion.


                                                   SNAUFFER, J.

WE CONCUR:


POOCHIGIAN, ACTING P. J.


DETJEN, J.